UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ELMORE ENERGY, LLC, a Georgia limited liability company, | ) ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 04 C 8059 |
| COMMONWEALTH EDISON COMPANY, an Illinois corporation, and EXELON GENERATION COMPANY, LLC, a Pennsylvania limited liability company, | ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

## MEMORANDUM AND OPINION ORDER

Plaintiff Elmore Energy, LLC has filed suit against Defendants Commonwealth Edison Company ("ComEd") and Exelon Generation Company, LLC, seeking commission payments due from the sale of three gas turbines owned by Exelon Generation. Elmore Energy advances several theories of relief, including breach of contract, promissory estoppel, quantum meruit, and unjust enrichment. Exelon Generation has moved to dismiss the breach of contract claim for failure to allege the existence of an enforceable contract. For the reasons set forth below, the motion is denied.

## BACKGROUND

Elmore Energy is a Georgia limited liability company with its principal place of business in Acworth, Georgia.[1] It's sole member and manager is a citizen of the State of Georgia. (Cmplt. ¶ 1.) ComEd, an Illinois energy services company with its principal place of business in Chicago, Illinois, delivers electricity to customers in northern Illinois. (See http://www.exeloncorp.com/comed/overview/ecr_overview.shtml.) ComEd is an affiliate of Exelon Generation Company and

---

[1] The Complaint does not describe Elmore Energy's business and the court was unable to locate any information in that regard.

does business as, among other things, "Exelon Nuclear," "Exelon Power," and "Exelon Generation." (Cmplt. ¶¶ 2, 3.) Exelon Generation Company ("Exelon") "manages a diverse portfolio of natural gas, coal, hydro, nuclear, solar and wind generated electricity." (See http://www.exeloncorp.com/generation/genco/g_overview.shtml.) Exelon is a Pennsylvania limited liability company with principal places of business in Kennet Square, Pennsylvania, and Warrenville, Illinois. Plaintiff alleges that Exelon's members are citizens of states other than Georgia. (Cmplt. ¶ 3.)

### A. The Marketing Agreement

On or about December 12, 2002, Exelon engaged Elmore Energy to find a purchaser for three General Electric 7FA gas turbines owned by Exelon. The parties memorialized the engagement in a written Energy Marketing Agreement (the "Marketing Agreement") signed on January 30, 2003 by Elmore Energy's President, Chris Elmore, Exelon's Vice President of Nuclear Supply, Kevin Yessian, and Exelon's Investment Recovery Manager, Thomas Cromeans. (Id. ¶ 6; Marketing Agreement, Ex. A to Cmplt., at 3.) The Marketing Agreement was effective from December 12, 2002 to July 11, 2003, and provided that Exelon would pay Elmore Energy a "success fee" of "1.2% of the first $20,000,000 of asset value that is sold." (Id. ¶ 7; Marketing Agreement, at 1.) The Marketing Agreement further provided that in the event Exelon terminated the agreement prior to the expiration date, or sold the gas turbines on its own to one of three specified parties, Elmore Energy would not be entitled to a "success fee," but Exelon would pay the company $10,000 per month for "expenses and effort," up to $60,000. (Id.)

### B. The Amendment

Due to a declining market, Elmore Energy was unable to sell any of the gas turbines prior to the expiration of the Marketing Agreement. Elmore Energy and Exelon thus began negotiations in June 2003 to extend the terms of the agreement for one year. (Id. ¶¶ 8, 9.) Tom Cromeans of Exelon asked Chris Elmore to draft a proposed amendment (the "Amendment"), which Elmore

forwarded to Cromeans by e-mail on June 18, 2003. The Amendment extended the Marketing Agreement until July 11, 2004, and provided that Exelon would pay Elmore Energy $5,000 per month in marketing fees beginning July 11, 2003, up to a maximum of $60,000. The marketing fees were to be deducted, however, from any "success fees" owed pursuant to the original Marketing Agreement. The Amendment further provided that in the event Exelon terminated the agreement prior to its expiration, Exelon would pay Elmore Energy $60,000 in termination fees. (*Id.* ¶ 9; E-mail from C. Elmore to T. Cromeans of 6/18/03, Letter from C. Elmore to T. Cromeans of 6/18/03, and Amendment to Exelon and Elmore Energy Marketing Agreement, Group Ex. B to Cmplt.)

At some point after Cromeans received the proposed Amendment, he informed Chris Elmore that he had reviewed the proposal with Theodore Jennings, Vice President of Engineering & Operations of Exelon Power, and with David Wozniak, Vice President Special Projects of Exelon, and had "received approval to accept the Amendment."[2] (*Id.* ¶ 10.) Based upon Cromeans' assurances that Exelon had approved the Amendment, Elmore Energy asked Exelon to pay a July 1, 2003 invoice for monthly marketing fees as provided for under that Amendment, in the amount of $5,000.[3] (*Id.* ¶ 11.) Rick Madsen, Investment Recovery Specialist at Exelon, informed Chris Elmore that Exelon would prefer to pay Elmore Energy's monthly marketing fees in one lump sum. He therefore requested an invoice for $60,000 to cover the entire term of the Amendment.[4] (*Id.* ¶ 12.)

---

[2] The Complaint does not indicate when Cromeans spoke with Jennings and Wozniak, or provide any details regarding those conversations. Nor does it indicate when Cromeans notified Chris Elmore that Exelon would accept the proposed Amendment.

[3] It is not clear from the Complaint who at Elmore Energy requested the payment, when or how the request was made, or to whom it was directed.

[4] The Complaint does not indicate when Madsen made the request, or the form of that request.

On August 8, 2003, Elmore Energy sent Exelon an invoice in the amount of $60,000, as requested. On August 19, 2003, Exelon issued Elmore Energy a $60,000 check with the following written on the receipt stub: "for Sale of Three GE 7FA Gas Turbines per the Exelon and Elmore Energy Marketing Agreement Commencing on December 12, 2002 and as Amended." (*Id.* ¶ 13; Check from Exelon to Elmore Energy of 8/19/03, Ex. C to Cmplt.) Upon receiving the $60,000 in marketing fees, and "in reliance upon the oral agreement with Exelon representatives," Elmore Energy continued its efforts to sell the three gas turbines. (*Id.* ¶ 14.)

### C. The Sale of the Gas Turbines

In October 2003, Elmore Energy entered into discussions with David Hartzell, President of ITM Associates, Inc., who advised that he had been retained by Xcel Energy to assist in purchasing the three GE 7FA gas turbines.[5] (*Id.* ¶ 15.) Throughout October, Elmore Energy continued to perform under the Amendment, including providing Hartzell with "a great deal of technical and commercial information" relating to the gas turbines. Elmore Energy alleges that Exelon was aware at all times of Elmore Energy's marketing work and discussions with Xcel Energy. (*Id.* ¶¶ 16, 17.)

On October 23, 2003, Elmore Energy "caused a confidentiality agreement to be signed between Exelon and Xcel Energy" relating to the gas turbines. (*Id.* ¶ 18.) On October 28, 2003, Chris Elmore sent Theodore Jennings of Exelon an e-mail message reminding him to execute the Amendment, and attaching another copy of that document. Jennings responded to the e-mail the next day, stating that Exelon would neither renew the agreement nor engage in any exclusive agreements in the future. (*Id.* ¶¶ 19, 20.) The following day on October 30, 2003, Xcel Energy sent Exelon a purchase offer for the gas turbines. (*Id.* ¶ 18.) Xcel Energy ultimately purchased the three gas turbines in December 2003 for $14 million each. (*Id.* ¶ 21.)

---

[5] The Complaint does not indicate who from Elmore Energy spoke with Hartzell, or how those discussions came about.

4

On February 5, 2004, Elmore Energy sent Exelon an invoice in the amount of $444,000 to cover its commission – minus payments received for monthly marketing fees – for the sale of the three turbines to Xcel Energy. By letter dated March 15, 2004, Exelon informed Elmore Energy that it would not pay any commission associated with that sale.[6] (*Id.* ¶¶ 22, 23.)

### D. Elmore Energy's Lawsuit

Elmore Energy filed suit against ComEd and Exelon on December 14, 2004, alleging breach of contract, quantum meruit, promissory estoppel, and unjust enrichment based on Exelon's failure to pay the $444,000 commission. The court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. Both Defendants filed motions to dismiss on January 13, 2005, but Elmore Energy voluntarily dismissed ComEd as a defendant on February 27, 2005. Thus, the court will now consider Exelon's motion to dismiss the breach of contract claim.

## DISCUSSION

### A. Standard of Review

The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiff's complaint and draws all reasonable inferences in his favor. *Flannery v. Recording Industry Ass'n of Am.*, 354 F.3d 632, 640 (7th Cir. 2004); *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 770 (7th Cir. 2002).

---

[6] The Complaint does not indicate who at Exelon drafted the letter, or to whom at Elmore Energy it was addressed.

## B. Breach of Contract

To properly plead a cause of action for breach of contract under Illinois law,[7] a plaintiff must allege (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (1st Dist. 2000). Exelon argues that Elmore Energy cannot state a claim for breach of contract because the Marketing Agreement expired on July 11, 2003, and Exelon never signed the proposed Amendment despite signature lines for Exelon representatives, including Tom Cromeans, underneath the words "Accepted By: Exelon Nuclear." (Def. Mem., at 3) (citing *Mike Schlemer, Inc. v. Pulizos*, 267 Ill. App. 3d 393, 395, 642 N.E.2d 200, 202 (5th Dist. 1994) ("The acceptance [of an offer] must in every respect meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points and closing with them just as they stand.")) Exelon also notes that Theodore Jennings sent Chris Elmore an e-email message on October 29, 2003 expressly stating that Exelon would not renew the agreement or engage in any exclusive agreements in the future. This message, Exelon says, "shows that there *never existed* a valid, unambiguous contract that '[gave] an absolute right without further negotiations' to Elmore Energy." (*Id.* at 3-4) (emphasis in original) (quoting *Milani v. Proesel*, 15 Ill. 2d 423, 430, 155 N.E.2d 38, 42 (1958).)

Elmore Energy claims that Exelon orally agreed to the terms of the Amendment, which sufficed to extend the Marketing Agreement to July 11, 2004. Specifically, Tom Cromeans informed Chris Elmore on some unspecified date that he had reviewed the proposed Amendment

---

[7] Exelon cites exclusively Illinois law and Elmore Energy does not dispute that Illinois law governs this case. (*See* Exelon Generation Company, LLC's Memorandum in Support of its Motion to Dismiss Count I of Plaintiff's Complaint (hereinafter "Def. Mem."), at 3; Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss Count I of Plaintiff's Complaint (hereinafter "Pl. Resp."), at 6-10.)

with Jennings and David Wozniak, and had "received approval to accept the Amendment." (Cmplt. ¶ 10.) Elmore Energy asserts that Exelon engaged in conduct consistent with its acceptance of the Amendment when it asked to pre-pay the entire $60,000 in monthly marketing fees due over the term of the Amendment. Exelon also gave Elmore Energy a check for $60,000 on August 19, 2003, long after the Marketing Agreement itself had by its terms expired in July, and more than two months before Jennings sent his October 29, 2003 message to Chris Elmore purporting to renounce the agreement. The check, moreover, expressly stated that it was "for Sale of Three GE 7FA Gas Turbines per the Exelon and Elmore Energy Marketing Agreement Commencing on December 12, 2002 *and as Amended.*" (Pl. Resp., at 7 (emphasis added); Cmplt. ¶¶ 13, 14; Check from Exelon to Elmore Energy of 8/19/03, Ex. C to Cmplt.)

Exelon objects that Elmore Energy has not alleged a breach of an oral agreement, but only a breach of the unexecuted written Amendment. (Def. Reply, at 2.)[8] In fact, Elmore Energy has alleged that "[b]ased upon Tom Cromeans' [oral] assurances that the Amendment had been approved," it sought payment under the terms of that agreement, and that "in reliance upon the oral agreement with Exelon representatives, Elmore Energy continued to market the three gas turbines." (Cmplt. ¶¶ 11, 14.) On a motion to dismiss, this is sufficient to allege that Elmore Energy seeks to recover pursuant to an oral agreement, the terms of which are set forth in the written Amendment. *See, e.g., Blutcher v. EHS Trinity Hosp.*, 321 Ill. App. 3d 131, 138, 746 N.E.2d 863, 870 (1st Dist. 2001) ("[O]ral agreements, just as written agreements, are binding so long as there is clearly an offer and acceptance to compromise, and there is a meeting of the minds as to the terms of the agreement.")

As for Elmore Energy's allegations that Exelon performed under the agreement by paying the $60,000 in marketing fees, Exelon counters that "Plaintiff's own conduct shows it was well

---

[8] Exelon Generation Company, LLC's Reply Memorandum in Support of its Motion to Dismiss Count I of Plaintiff's Complaint is cited as "Def. Reply, at __."

aware that it did not have a contract in place." (Def. Mem., at 4.) Exelon points to the fact that Chris Elmore attempted to secure a signature on the Amendment in late October 2003, even though his company had purportedly been "continu[ing] to perform under the Amendment" since July 2003. (*Id.* at 4; Cmplt. ¶ 16.) In Exelon's view, Elmore Energy sought the signature due to "the realization that unless Exelon signed the Amendment, there was no contract between Plaintiff and Exelon, and Plaintiff was not entitled to a commission unless the parties were bound by a contract." (Def. Reply, at 2.) Elmore Energy denies this interpretation, claiming that

> such allegations can be read to simply establish an abundance of caution on the part of Elmore Energy, based on a concern that Jennings might try to weasel out of the deal because there was no written memorial of the terms, and a desire on Elmore Energy's part to confirm in writing the oral agreement reached four months earlier.

(Pl. Resp., at 9.)

Whatever Elmore Energy's motive may have been for seeking Exelon's signature in October 2003, it is not the proper subject of a motion to dismiss. Elmore Energy has alleged that Tom Cromeans agreed to extend the term of the Marketing Agreement as set forth in the Amendment, and that Exelon acted consistently with that agreement. *Cf. Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295 (7th Cir. 2002) (applying the Uniform Commercial Code, court observed that the Code "does not require that the contract itself be in writing, only that there be adequate documentary evidence of its existence and essential terms, which there was here.") Viewing the facts in a light most favorable to Elmore Energy, the Complaint sufficiently alleges breach of an oral contract.

### C. Contract Termination

Exelon argues that even if Elmore Energy has alleged the existence of a contract, Exelon terminated that agreement on October 29, 2003, when Jennings sent Chris Elmore an email message to that effect. (Def. Mem., at 4-5.) As Elmore Energy notes, however, the Amendment provides that

8

Exelon has no obligation to Elmore Energy, LLC for success fees or any other payment for deals constructed after the termination date of this agreement except for such deals introduced by Elmore Energy, LLC prior to termination date and buyer has executed a Confidentiality Agreement with Exelon prior to termination and buyer enters into a contract to purchase one or more units within twelve months after the termination date.

(Amendment, Ex. B to Cmplt.) Elmore Energy alleges that as a result of its marketing efforts, Xcel Energy signed a confidentiality agreement with Exelon on October 23, 2003, several days before the alleged October 29, 2003 termination date, and purchased the gas turbines in December 2003, well within the twelve month post-termination period. Thus, Elmore Energy has stated a claim for breach of contract even assuming that the agreement terminated on October 29, 2003.

## CONCLUSION

For the reasons stated above, Exelon's motion to dismiss the breach of contract claim (Docket No. 6) is denied.

ENTER:

Dated: May 19, 2005

REBECCA R. PALLMEYER
United States District Judge